NO. 7776

COURT OF APPEAL

PARISH OF ORLEANS.

7776

JULIUS G. MEYERS **7776**

versus

FRANK ROUSEO.

Dismissal; J.

Dinkel et al; J.

Plaintiff alleges that defendant is indebted unto him in the sum of $375.00, for this:

That he was run into and knocked down by a horse owned by defendant while crossing the corner of Canal and Chartres Streets in this City on the evening of December 18th, 1917, at or about 3 P.M.

Plaintiff further alleges that he was crossing Chartres Street, at the intersection of Canal Street, going from the direction of the Lake towards the River when he was struck by a horse belonging to the defendant, violently thrown to the ground and that said horse was running at a rapid and furious speed and that the impact of the blow caused him to be violently knocked down and seriously bruised.

Alleging also that the accident was caused entirely through the fault, negligence and gross carelessness of the defendant in permitting a vicious and uncontrollable horse to be upon the public thoroughfare and in no manner was contributed to by plaintiff but that he was absolutely unable to avoid said accident.

That as a result of said accident plaintiff sustained injuries to his left arm and body and from which he claimed he had suffered up to the filing of this suit. He alleges further that he had incurred expenses for doctor and medicines in the sum of $25.00 and for pain and suffering he was entitled to the sum of $350.00 and he prayed for judgment for both amounts.

The answer of the defendant denied the accident was caused entirely through the fault and negligence of himself by permitting a vicious and uncontrollable horse on the street, claiming that the horse in question was tame and gentle and had been that way for a period of four years prior to the filing of the present suit and never should any trace of viciousness.

15

The defendant's prayer is finally for a dismissal of this action.

The first witness examined in this case on behalf of plaintiff was one A. V. Dusand.

He testifies that he was the Traffic Policeman stationed on the Neutral Ground, Intersection of Canal, Chartres and Camp Streets; he saw the horse strike a float and the buggy go to pieces; that plaintiff was crossing Chartres Street as the horse kept coming, plaintiff being knocked down; he was taken into a drug store at the corner of Canal & Chartres Street where temporarily his wounds were dressed; he did not make any attempt to check the horse because the animal was pretty fiery; he frequently when on his beat let this horse cross over the street because he would not stand; knows the horse well and knows that the horse was always fiery and being the one who turned the semiphore he always gave the horse the right of way because he did not want to see anyone hurt; he has had quite a good deal of experience running horse, driving a float, breaking in animals and driving a wagon.

The next witness was one S. Mandella.

He was standing at the corner of Canal and Chartres Streets at the time of this accident. "Going into May's old Drug Store at the corner of Chartres and Canal and coming down to the corner I saw plaintiff on the opposite side of the street; everybody was looking towards Chartres Street and as I got to the corner I saw this horse running away and the buggy ran up against a float; the horse continued running up Canal Street and went up Camp Street; the officer in charge tried to stop him but he could not; knows plaintiff very well, lives across the street from his house, saw the horse knock plaintiff down and several people picked him up and brought him in-

C. W. Miller another wintess for plaintiff.

He did not see the accident but subsequently going into drug store saw plaintiff sitting in one of the arm chairs; found him very weak and nervous and he looked to be hurt inwardly; worked in the same office that plaintiff worked.

Plaintiff himself was the next witness and substantially his statement is to the following effect:

"I was leaving the office to go home about five o'clock in the evening, crossing Chartres Street, I was very careful, crossed over and took the best pavement to get to the Prytania Car; I saw a young man;I didn't know who he was and from his actions and his looks I became satisfied that there was something wrong and I tried to get over to the Godchaux side of the Street; I didn't know what was coming and I could not avoid it and this horse was coming along; I heard his hoofs and he threw me down and injured me, my leg was black and blue, my arm was all bruised and I was in a very nervous state; in the drug store they gave me something to quiet my nerves; afterwards was taken home and attended to there." In speaking of his injuries, plaintiff says "I suffered quite a long while and I still have not got the use of my left arm as I had it before this accident and I suffered possibly for two months afterwards, I could not get out my ledger, being a bookkeeper, and had to be assisted in having the book brought to me and it took several months before I could help myself and even today I havn't got the power I formerly had."

On cross examination of this witness an attempt was made to prove a compromise had been offered by plaintiff; that he had agreed to accept the sum of $40.00

17

in full settlement of his calim; the plaintiff abso-
lutely denied making any such offer and if he had it
not being in writing, could not be used in this case.

For defendant the witness first to testify was
Mr. Felix Rouseo,

When asked these questions:

Q. We are investigating an accident that oc-
curred on September 18th, 1917 about five o'clock in
the evening when Mr. Meyers the plaintiff claims to
have been injured by a horse owned by Mr. Frank Rouseo,
which ran away; will you relate in your own way what you
know about that accident?

A. Yes sir; that animal got scared on Chartres
between Canal & Customhouse from a motorcycle.

Q. Were you driving that horse?

A. Yes sir.

Q. Tell the Court what happened?

A. He go scared by a motorcycle on Chartres be-
tween Customhouse and Canal and he made two or three
springs and hit the float.

Q. Were you thrown from the buggy at the time of
the collission with the float?

A. Yes sir.

Q. You were knocked unconcious?

A. yes sir.

Q. You know nothing about the accident to the
plaintiff in this case?

A. No sir.

Q. Was that horse a vicious animal?

A. No sir; he is a pleasing animal, I have driven
him for two years.

On cross examination this witness persisted that
this was a gentle xxx horse and the accident occurred
through fright from the motorcycle.

18

F. E. Dole, the next witness for the defendant did not see this accident; knows the horse in question, is a fine driving horse and sorrel; has known that horse for six or seven years, he was a tame and gentle animal; had driven him fifty or sixty times all over the city, over parades and everywhere else, never heard of that horse running away before.

The next witness, Joseph Narro, knows kx nothing of the accident in question; knew the horse for a long while; he is a very pretty shrrel horse, a fancy horse, gentle, easily guided, any lady can drive him; never knew or heard of his having run away prior to this time.

We have thus substantially given the main portions of the testimony of all witnesses who testified in this case, pro and con. It is very evident from the testimony particularly that of the officer who knew the animal for a long time, had occassion on his beat to watch him very closely; he was a very fiery horse and on every occassion that it was possible to turn the semiphore to give the horse the right of way he did so in order that no one would be injured; he has no interest in this case whatsoever and has thoroughly explained to our satisfaction his knowledge of animals pxxxx prior to his becoming a policeman and we are satisfied that his statements are true in every particular; he saw this accident, could not prevent it because he was afraid of the animal in question, knew his character, that if he attemped to check him he would either be seriously injured himself or killed outright.

The other xxxxx witnesses' testimony from which we have quoted satisfies us that the plaintiff in this suit was injured just as testified to by him and that from the injuries after being attended to at the drug store subsequently employed a physician, bought medicines and for quite a while, although going to his business the very next day, he became a xxxxxxx ner-

19

vous man and besides being a bookkeeper could not handle his ledger but was compelled to have others do it for him.

The son of the defendant who was driving the animal claims that the accident occurred because a motorcycle ran into him, the horse run away and collided with a float knocking the buggy to pieces and throwing him therefrom knocking him unconcious so that he h d to be taken to the Charity Hospital for, attention.

It is a strange coincidence that no one heard or saw the motorcycle in question save and except this witness  If is/un fortunate, if it be true, that there were no other witnesse: present to testify to the same fact, if it was a fact.  Being unconcious he was unable and did not see plaintiff in this case at the time of the accident nor afterwards; beyond his te timony the testimony of the other witnesses on behalf of the defendant do no impress us very favorably; they all testify as to this being a gentle horse, never vicious, could be driven by a lady and ther testimony to like effect.   We are inclined to the believe that this is not true; the character of this horse is established by the patrolmen in this case who had seen this horse time and again, had watched his movements, knew he was a vicious animal and not ishing to see anyone hurt always gave this horse the right of way.

Fortunately for the defendant in this case, plaintiff was not seriously hurt but a stroke of this character, irrespective of the bodily injuries is sufficient to justify a reasonable judgment such as rendered by the learned Jud e in this case.

20

We have carefully examined this record; we have read every line of the testimony, pro and con, and we are convinced plaintiff has maintained his action just as the Court aquo decided he had.

Issues of fact mainly involved.

"The owner of an animal is responsible for the damage he has caued and the burden is on the owner to prove that he was without fault, and did all that was possible to prevent the accident.

An owner, knowing the character of the horse, uses him in frequented places, does so at his own risk; it is only where the happening could not reasonably be anticipated by him, that the risk may be said to be assumed by the public."
Aymani vs. Frank Russo, 6th Court of Appeal, p. 169.

For the reasons assigned it is ordered, adjudged and decreed that the judgment of the Lower Court be and it is hereby affirmed, with costs of both courts to be paid by the defendant.

-Judgment Affirmed-